**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:08CV185-C**

| | |
|---|---|
| DANIEL G. SCHMIDT, III, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND RECOMMENDATION** |
| ) | |
| WACHOVIA BANK, N.A. f/k/a ) | |
| FIRST UNION NATIONAL ) | |
| BANK, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on the "Defendant's Motion to Dismiss" (document #11) and "Memorandum in Support . . ." (document #12), both filed June 9, 2008. The Plaintiff filed his ". . . Memorandum in Opposition . . ." (document #16) July 24, 2008. On August 11, 2008, the Defendant filed its ". . . Reply Memorandum . . ." (document #18).

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and the Defendant's Motion is now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will respectfully recommend that the Defendant's Motion to Dismiss be denied, as discussed below.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This is an action seeking relief for "constructive fraud based upon breaches of fiduciary duty by Defendant," and punitive damages. The Plaintiff is a citizen and resident of Pickens County, South Carolina. The Defendant is a federally chartered commercial banking association with its

principal place of business in Charlotte, North Carolina. The Defendant served as the Plaintiff's investment advisor from 1998-2002.

The Plaintiff, a physical therapist, founded Professional Rehabilitation, Inc. ("PRI") in 1986. PRI provided physical therapy services to hospitals, long-term care facilities, school districts, and outpatient offices. Over the next twelve years, the Plaintiff added three other health care companies to his business – including Professional Rehabilitation Agency, Inc., Professional Rehabilitation of Georgia, Inc., and JDBK, Inc. (collectively referred to as the "PRI companies"). During this time the Plaintiff and the PRI companies developed a business relationship with the Defendant.

In 1997, the Plaintiff engaged a business brokerage firm, Robinson Humphrey Company, Inc. ("Robinson Humphrey"), to sell the PRI companies. Robinson Humphrey procured a buyer, Paragon Health Network, Inc. ("Paragon"), for the PRI companies at a price of $48 million – $23 million in cash and $25 million in Paragon stock.

During the Plaintiff's negotiations with Paragon, the Defendant became involved in the sale by providing some of the Plaintiff's financial information necessary for due diligence discovery. After the May 1, 1998 closing of the sale (on approximately May 19, 1998), representatives of the Defendant contacted the Plaintiff regarding tax strategies and management of his newly acquired stock and cash.

At the sale closing, the Plaintiff had been advised by a Robinson Humphrey representative that he should "collar" his Paragon stock shares, and that Robinson Humphrey could complete the collar transaction for him. As the Plaintiff's Complaint alleges:

> A "collar" refers to the ceiling and floor of the price fluctuation of an underlying asset. A collar is usually set up with options, swaps, or by other agreements. In corporate finance, the collar strategy of buying puts and selling calls is often used to

mitigate the risk of a concentrated position in (sometimes) restricted stock. When the restricted owner cannot sell the stock, but needs to diversify the risk, a collar transaction is one of the few tools available. Many corporate executives who receive chunks of their compensation in restricted stock need to employ this strategy to mitigate the diversification risk in their overall portfolio.[1]

The Plaintiff told Robinson Humphrey that the Defendant served as his financial consultant and that he would rely on its advice. The Plaintiff alleges that he thereafter "repeatedly" told the Defendant's representatives that "he wanted to be protected against loss, whether by selling, collaring, or hedging his Paragon stock," and that at a meeting with the Defendant shortly after the sale closing, the Plaintiff was assured by the Defendant's representative that he would "look into" the collaring issue. It is undisputed that the Defendant did not collar or hedge the Plaintiff's position in Paragon, that the value of the stock continued to decline, and that the company ultimately declared bankruptcy in 2000.

The Plaintiff alleges that during this time he placed his trust and confidence in the Defendant and that it, through its representatives, acted as his fiduciary. The Plaintiff further alleges that the reason the Defendant breached its fiduciary duty (as discussed above) to the Plaintiff was because of its extensive lending relationship with Mariner Health Group, Inc. ("Mariner"), a relationship the Defendant did not disclose to the Plaintiff.

The Mariner relationship is relevant to the subject dispute because at the same time the Plaintiff was preparing for the sale of the PRI companies to Paragon, the Defendant was working with Mariner regarding its impending acquisition by Paragon. According to the Plaintiff, the

---

[1] As the Defendant points out, this definition comes from www.advfn.com/money-words_term_928_collar.html. The Defendant also points out that although the Plaintiff's Complaint does mention hedging and collaring, collaring "is a form of hedging that protects against a precipitous loss in value of a particular stock." The Defendant asserts that there are no allegations in the Complaint which support a theory that the "hedging" mentioned is any different from the "collaring."

3

Defendant knew of "Mariner's aggressive strategy to acquire companies in an attempt to build a national health care empire at the cost of inadequate capital reserves."[2] The Plaintiff alleges that "had he known of the Paragon/Mariner transaction, and . . . the details of the pending Paragon/Mariner transaction, including specifically how leveraged the combined entity would be post-closing, he would have refused to go forward with the transaction as it was then structured."

He further alleges that the reason the Defendant did not collar his Paragon stock was because it knew that if the Plaintiff sold his stock, amounting to two percent of Paragon's outstanding shares, the sale "had the real potential for materially depressing the price of Paragon stock, driving it down substantially, and thereby jeopardizing the Pargon-Mariner transaction." The Defendant allegedly needed the Paragon-Mariner transaction to proceed without any "hitch" because of its "significant investment of loans to Mariner," and "refused to collar the shares because it did not want to jeopardize its collateral, thereby benefitting itself over the interests of Plaintiff."

Although the Defendant does not dispute the facts for purposes of the subject Rule 12(b)(6) Motion, it requests the Court take judicial notice of the Plaintiff's position in other lawsuits (he has filed at least three other lawsuits related to the underlying transaction), in which he stated his stocks were restricted and he was prohibited from selling them. See Norfolk Southern Ry. Co. v. Shulimson Bros. Co., Inc., 1 F. Supp. 2d 553, 554 n.1 (W.D.N.C. 1998) (noting that when resolving a motion to dismiss a court may take judicial notice of matters of public record without converting the motion to one for summary judgment).

---

[2]The Complaint alleges that Paragon was acquiring Mariner, although this statement appears to contradict that assertion. The Court will assume that this statement is meant to show that Mariner, through its own acquisitions, was attempting to build a national health care empire at the cost of inadequate capital reserves – making it an unattractive prospect.

## II. MOTION TO DISMISS

### A. Standard of Review

"A motion to dismiss under [Fed. R. Civ. P. 12(b)(6)] tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir.), cert. denied, 510 U.S. 828 (1993), citing 5A C. Wright & A. Miller, Fed. Practice and Procedure §1356 (1990).

"A pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In the United States Supreme Court's recent examination of this standard, it explained:

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels or conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact). . . . And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely."

See Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955, 1964-65 (May 21, 2007) (internal citations omitted).

In considering a Rule 12(b)(6) motion, the complaint must be construed in the light most favorable to the nonmoving party, assuming factual allegations to be true. See, e.g., Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); Martin Marietta v. Int'l Tel. Satellite, 991 F.2d 94, 97 (4th Cir. 1992); and Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989).

## B. Constructive Fraud Claim

The Defendant argues that the Plaintiff's constructive fraud claim must fail because he has failed to allege an essential element of the claim under North Carolina law – that the Defendant sought and received a specific and definite benefit.

"In order to maintain a claim for constructive fraud, [a plaintiff] must show that [he] and [the defendant] were in a 'relation of trust and confidence . . . [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.'" Barger v. McCoy Hillard & Parks, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997), quoting Rhodes v. Jones, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950). The North Carolina Supreme Court has found it "implicit" in the elements of constructive fraud that "the defendant must seek his own advantage in the transaction; that is, the defendant must seek to benefit himself." Id. at 667, 61 S.E.2d at 224 (finding the "benefit" of a continued business relationship insufficient to establish the benefit needed for a constructive fraud claim). See, e.g., White v. Consolidated Planning, Inc., 166 N.C. App. 283, 294, 603 S.E.2d 147, 155-56 (2004) (stating that the defendant's "wrongful benefit" is an element of constructive fraud).

The alleged benefit must be more than "payment of a fee to a defendant for work done by that defendant." Nationsbank of North Carolina, N.A. v. Parker, 140 N.C. App. 106, 114, 535 S.E.2d 597, 602 (2000). See, e.g., White, 166 N.C. App. At 295, 603 S.E.2d at 156 (stating that the "plaintiff must allege that the benefit sought was more than a continued relationship with the plaintiff or payment of a fee to a defendant for work it actually performed" and dismissing constructive fraud claim because benefit alleged was nothing more than payment of commissions).

In pleading a constructive fraud claim, less particularity than when pleading actual fraud is required "because it is based on a confidential relationship rather than a specific misrepresentation."

Terry v. Terry, 302 N.C. 77, 85, 273 S.E.2d 674, 678-79 (1981) ("[t]he very nature of constructive fraud defies specific and concise allegations"). See, e.g., Hunter v. Guardian Life Ins. Co. of America, 162 N.C. App. 477, 482-83, 593 S.E.2d 595, 599-600 (2004) (noting the less stringent standard for particularity in a constructive fraud claim, but finding mere allegation "that defendants 'failed to perform according to such fiduciary and confidential relationship in the best interest of the Plaintiff[s], and performed in the best interest of the Defendants, damaging the Plaintiffs as outlined herein'" insufficient).

The Defendant argues that the Plaintiff's allegations – (1) that it failed to collar the Paragon stock; (2) that the Plaintiff's retention of the stock kept the Paragon stock price high; (3) that this high stock price encouraged the Mariner shareholders to vote in favor of the acquisition; and (4) which all in turn benefitted the Defendant by protecting its substantial loans to Mariner – is too indefinite and indirect to qualify as a "benefit" to it under North Carolina law.

Mindful of the applicable standard of review, the Court reaches a contrary conclusion. Although the Defendant makes arguments and raises points in its defense that may ultimately prevail, the Plaintiff has clearly alleged a benefit to the Defendant – one which does not rest on commissions or fees paid for actual work performed. Specifically, as set forth in the preceding section, the Plaintiff has alleged that the Defendant breached its fiduciary duty to him because it stood to gain more by making sure that the best interests of another customer (Mariner) were served. At a stage in the proceedings when the Plaintiff's allegations must be taken as true, these allegations are sufficient.

### C. "Plausible on its Face" (Twombly Standard)

The Defendant also argues that the Complaint is not plausible on its face because of the Plaintiff's admission in prior lawsuits that his stock was restricted from sale but now alleges that the

Defendant committed wrongdoing by failing to sell it. Similarly, the Defendant also argues that the Plaintiff's "failure to allege how a collar transaction could have affected the price of his Paragon stock makes his claim thoroughly implausible."

The Plaintiff counters by arguing that his "stock was salable to the public, just not through a standard, everyday stock exchange transaction customarily used to resell shares." The Court, asserts the Plaintiff, "can take judicial notice that common stock in public companies can be sold through private offerings to institutional investors." He also argues that he has alleged that a collar transaction would have impacted the price of Paragon stock, because eventually the collar transaction would have been executed and the stock sold.

As discussed in the "Standard of Review" section, the United States Supreme Court recently clarified the standard for courts to apply when reviewing a Motion to Dismiss as follows:

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels or conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact). . . . And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely."

See Twombly, 127 S. Ct. at 1964-65 (internal citations omitted). "Additionally, the complaint must be dismissed if it does not allege 'enough facts to state a claim to relief that is *plausible* on its face.'" Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (emphasis in original), quoting Twombly, 127 S. Ct. at 1974.

While it is true that Twombly has clarified and perhaps somewhat tightened the standard of review governing a Rule 12(b)(6) Motion, the Court concludes that the Plaintiff's allegations are sufficient to survive dismissal at this early stage of the proceedings. As discussed above, he has pled

8

the essential elements of a constructive fraud claim.  Further, the parties' respective requests that the Court take "judicial notice" of certain facts tend to contradict each other, and "[a] motion to dismiss . . . does not resolve contests surrounding the facts." Republican Party of North Carolina, 980 F.2d at 952.

## III.  RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that the Defendant's Motion to Dismiss (document #11) be **DENIED**.

## IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same.  Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003);  Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990).  Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court.  Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005);  Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365.  Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal.  Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Robert J. Conrad, Jr.

**SO RECOMMENDED AND ORDERED.**

Signed: August 19, 2008

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge